[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: MOTION FOR SUMMARY JUDGMENT (#101)
I. FACTS
The plaintiff, Hartford Hospital, is designated a not for profit corporation, specially chartered by the General Assembly of the State of Connecticut. (Plaintiff's Complaint, p. 1; Joint Memoranda of Law in Support of Motion for Summary Judgment, Affidavit of Rhonda Anderson, Exhibit 1, ¶ 4). In 1877, Hartford Hospital established the Hartford Hospital School of Nursing ("School of Nursing") for the purpose of "promoting and enhancing the quality and efficiency of nursing care at the Hospital through the training and education of nurses principally for employment at the Hospital." (Plaintiff's Complaint, pp. 1-2). In June, 1976, Hartford Hospital closed its School of Nursing, choosing instead to employ nurses who had graduated from independent institutions of higher learning. Id., p. 2. Nevertheless, Hartford Hospital established a Division of Nursing Education and Research to provide educational programs furthering "the knowledge, skills and training of staff nurses at the Hospital, through fellowship and scholarship programs for staff nurses seeking further professional education and through programs which recognize and encourage excellence in nursing at the Hospital." Id., p. 3.
Prior to its closing, four bequests and five pecuniary gifts were made to the School of Nursing. These donations resulted in ten endowment funds[1]: the William Gillett Sexton Fund, the Endowment Fund for the School of Nursing, the Austin Cornelius Dunham Training School Nurses' Prize Fund, the Doctor John Butler McCook Fund, the Sophia A. Risley Fund, the CT Page 3770 Doctor Oliver C. Smith Fund No. 1, the Doctor Oliver C. Smith Fund No. 3, the School of Nursing Loan Fund, the Maude Ashley Scholarship Fund, and the School of Nursing Consolidated, Income Fund. The total value of these ten funds is $1,195,985.03.
These funds are monitored by the defendant, the Connecticut Attorney General, who pursuant to General Statutes § 3-125, is required to represent "the public interest in the protection of any gifts, legacies or devisees intended for public or charitable purposes." Accordingly, on November 14, 1995, Hartford Hospital filed a ten-count complaint against the Connecticut Attorney General, arguing that although the specific intent of the donors can no longer be fulfilled, utilizing the modified doctrine of cy pres, or approximation, and/or General Statutes § 45a-533 (b), the general charitable intent of the donors can be fulfilled by releasing the principal and/or income from these ten funds to be used in educational, fellowship, and scholarship programs by the Division of Nursing Education and Research. On November 30, 1995, Hartford Hospital and the Connecticut Attorney General filed a joint motion for summary judgment as to all counts of the plaintiff's complaint. In addition, in accordance with Practice Book §§ 204 and 380, on the same date, Hartford Hospital and the Connecticut Attorney General filed a joint memorandum in support of their motion for summary judgment.
II. STANDARD
"Summary judgment is a method of resolving litigation when pleadings, affidavits, and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law . . . The motion for summary judgment is designed to eliminate the delay and expense of litigating an issue when there is no real issue to be tried." (Citations omitted.)Wilson v. New Haven, 213 Conn. 277, 279, 567 A.2d 829 (1989). See also Kakadelis v. DeFabritis, 191 Conn. 276, 281,464 A.2d 57 (1983). The summary judgment procedure "`is an attempt to dispose of cases involving sham or frivolous issues in a manner which is speedier and less expensive for all concerned than a full-dress trial.'" Mac's Car City, Inc. v. AmericanNational Bank, 205 Conn. 255, 261, 532 A.2d 1302 (1987).
"`The test [for the grant of a motion for summary CT Page 3771 judgment] is whether a party would be entitled to a directed verdict on the same facts.'" Suarez v. Dickmont PlasticsCorp., 229 Conn. 99, 105-06, 639 A.2d 507 (1994). "A directed verdict is appropriate when the jury could not reasonably and legally have reached any other conclusion." (Internal quotation marks omitted.) Boehm v. Kish, 201 Conn. 385, 393
n. 4, 517 A.2d 624 (1986).
Each of the four bequests and five pecuniary gifts were made to Hartford Hospital for the benefit of the School of Nursing. Accordingly, upon the close of the School of Nursing in 1976, the purpose of the ten funds could no longer be carried out. Therefore, Hartford Hospital has proposed, and the Connecticut Attorney General supports, an alternative use of these funds on the basis of two grounds: the modified doctrine of cy pres, known as the doctrine of approximation, and/or General Statutes § 45a-533 (b).
A. The Connecticut Uniform Management of InstitutionalFunds, General Statutes §§ 45a-525 through 45a-539
Section 45a-533 (b) of the General Statutes, applicable in the present case because all the donors are deceased, provides that "[i]f written consent of the donor cannot be obtained by reason of his death, disability, unavailability or impossibility of identification, the governing board of a fund may apply, in the name of the institution, to the superior court for a judicial district in which the institution conducts its affairs for release of a restriction imposed by the applicable gift instrument on the use or investment of aninstitutional fund. The attorney general shall be notified of the application and shall be given an opportunity to be heard. If the court finds that the restriction is obsolete,inappropriate or impracticable, it may by order release the restriction in whole or in part." (Emphasis added.)
For the court to be able to release the use restriction, the donation must qualify as an institutional fund and the restriction must be obsolete, inappropriate or impracticable.
(1) Institutional Fund
"Institutional fund" is defined in General Statutes § 45a-527 (2) as "a fund held by an institution for its exclusive use, benefit or purposes, but does not include . . . (B) a CT Page 3772 fund in which a beneficiary that is not an institution has an interest, other than possible rights that could arise upon violation or failure of the purposes of the fund[.]" Rhonda Anderson, Executive Vice President of Hartford Hospital, attests that Hartford Hospital "is an `institutions within the meaning of the Connecticut Uniform Management of Institutional Funds Act (`CUMIFA'), Conn. Gen. Stat. § 45a-527 (1),[2] as it is an incorporated organization organized and operated exclusively for educational, religious, charitable or other eleemosynary purposes." (Joint Memorandum of Law in Support of Motion for Summary Judgment, Affidavit of Rhonda Anderson, Exhibit 1, ¶ 4).
Based on the definition of "institutional fund," it appears that because Hartford Hospital is an "institution" within the meaning of CUMIFA, funds held by Hartford Hospital qualify as "institutional funds." However, the definition of "institutional fund" excepts funds in which a beneficiary other than an institution could have an interest in the fund upon the institution's inability to effect the specific purpose of the fund. This exception, in conjunction with the language "exclusive use, benefit, or purposes," was discussed in Yale University v. Blumenthal, 225 Conn. 32, 621 A.2d 1304
(1993), where a fund was established for the purpose of building a wing at Yale Medical Society for treatment of the "sick poor."
In Yale University v. Blumenthal, id., 37, the Connecticut Supreme Court was presented with the question of whether a restriction placed on a fund, such as limiting the use of the fund for a specific purpose, places the fund within the scope of General Statutes § 45a-527 (2)(B). If so, that fund will not qualify as an institutional fund within the meaning of CUMIFA. In addressing this question, the Connecticut Supreme Court noted that "the issue appears to be one of first impression." Id.
The Connecticut Supreme Court stated that "[i]n the absence of prior authority to aid in the interpretation of 45a-527 (2)(B), we are guided by the meaning ascribed by its drafters to the parallel provision of the Uniform Management of Institutional Funds Act (UMIFA)." Id. Specifically, the Court noted that the language "its exclusive use, benefit or purposes" was "adopted verbatim by the Connecticut legislature from the language of 1(2) of UMIFA, 74 U.L.A. 712 (1985)." CT Page 3773 Id. The Court went on to highlight the "published comments to that section, [where] the commission that drafted UMIFA explained that the placing of a restriction on the use of a gift or bequest to an institution does not mean that the gift or bequest is not for the `exclusive use, benefit or purposes' of the institution provided that the appointed use is one that is within the institution's lawful purposes. The commission commented that [t]he use, benefit or purposes of an institution broadly encompasses all of the activities permitted by its charter or other source of authority. UMIFA, 1(2), comment 7A U.L.A. 713 (1985). Moreover, the commission noted that a `fund to provide scholarships for students or medical care for indigent patients is held by the school or hospital for the institution's purposes.'" (Internal quotation marks omitted.) Id., 37-38. The Court concluded that "[f]rom the explanatory comments of the commission that drafted UMIFA and a plain reading of 45a-534, we discern that it was the legislative intention that a fund bequeathed to an institution, for the ultimate benefit of an inchoate group or class, through the medium of the institution, is held by the institution for its `exclusive use, benefit or purposes' within the meaning of 45a-527 (2)(B) and therefore is an institutional fund." Id., 40.
The four bequests and five pecuniary gifts were made to Hartford Hospital, an institution, for the benefit of a class of persons, the students at the School of Nursing. Thus the ten funds were held by Hartford Hospital for its "exclusive use, benefit or purposes," within the meaning of General Statutes § 45a-527 (2) and the ten funds constitute "institutional funds" within the meaning of General Statutes § 45a-533.
(2) Obsolete, Inappropriate, or Impracticable
The four bequests and five pecuniary gifts were to be used only for the benefit of the School of Nursing. Although the School of Nursing was closed in 1976, the Division of Nursing Education and Research was subsequently opened. The use restriction placed on the ten funds is not obsolete or inappropriate but it is impracticable.
Based on the foregoing, the court believes that General Statutes § 45a-533 applies to the present case. Therefore, the court should order release of the use restriction. CT Page 3774 However, CUMIFA does not provide guidance as to the purpose for which the restriction may be released. Nevertheless, General Statutes § 45a-533 (d) does provide that "[t]his section does not limit the application of the doctrine of cy pres or approximation." Accordingly, this court will address the application of the doctrine of cy pres, or approximation, to the present case.
B. Modified Doctrine of Cy Pres or Approximation
"The modified doctrine of cy pres, or of approximation, which [Connecticut has] adopted . . . exists only when, and in so far as, the specific method adopted by the testator for carrying his general intent into effect can no longer be executed." Newton v. Healy, Attorney General, 100 Conn. 5,10-11, 122 A. 654 (1923). In determining when the donor's specific intent can no longer be implemented, Connecticut follows the Restatement (Second) of Trusts § 399, which provides that "`[i]f property is given in trust to be applied to a particular charitable purpose, and it is or becomesimpossible or impracticable or illegal to carry out the particular purpose, and if the settlor manifested a more general intention to devote the property to charitable purposes, the trust will not fail . . ." (Emphasis added.)
Charitable trusts "affect the welfare of individuals and of the community; as a consequence of their public nature our law treats them, whether created by deed or will, upon a different and broader basis than gifts of a mere private nature. It favors them, and construes them with the utmost liberality, in order to carry out the charitable purpose of the donor." First Congregational Society v. Bridgeport,99 Conn. 22, 30, 121 A. 77 (1923). Therefore, when the charitable purpose becomes impossible, impracticable or illegal, "the necessity of preserving and effectuating the general charitable purpose of the testator justifies the substitution of a method which seems to be as nearly approximate as existing condition will permit." Newton v.Healy, Attorney General, 100 Conn. 5, 11, 122 A. 654 (1923).
The power to make this substitution lies with the Superior Court, which "`as a court of equity, possesses the power to carry out the general intent of the donor of a testamentary charitable trust, when clearly manifested, though the particular form or manner pointed out by the testator CT Page 3775 cannot, because of changed conditions, be followed." Shannonv. Eno, 120 Conn. 77, 87, 179 A. 479 (1935). With this power, "`the court will direct the application of the property to some charitable purpose which falls within the general purpose of the settlor.'" Id. In other words, "[i]n exercising its powers under the doctrine of approximation (cy pres), a court must seek a method or result which as nearly as possible effectuates the intent of the testator." Lockwood v. Killian,179 Conn. 62, 67, 425 A.2d 909 (1979).
Based on the foregoing cases, and the Restatement (Second) of Trusts, three elements must be met before the court can invoke the modified doctrine of cy pres or approximation. First, the purpose of the trust must be charitable in nature. See Connecticut Bank Trust Co. v.Coles, 150 Conn. 569, 574, 192 A.2d 202 (1963). Second, this specific charitable purpose must have become impossible, impracticable, or illegal. See Shannon v. Eno, supra,120 Conn. 86. Third, the settlor must have manifested "a general intent to devote the property to a charitable use, to which the intent that it go to the particular organization named is secondary." Duncan v. Higgins, 129 Conn. 136, 140,26 A.2d 849 (1942).
(1) Charitable Purpose
It is undisputed that the donors of the ten funds intended to benefit the School of Nursing. The question for this court is whether such an intention qualifies as a charitable purpose. "`The definition of charitable uses and purposes has expanded with the advancement of civilization and the daily increasing needs of men. . . . It no longer is restricted to mere relief of the destitute or the giving of alms but comprehends activities, not in themselves self supporting, which are intended to improve the physical, mental and moral condition of the recipients and make it less likely that they will become burdens on society and more likely that they will become useful citizens. . . . Charity embraces anything that tends to promote the welldoing and the well-being of social man. . . . An institution is charitable when its property and funds are devoted to such purposes as would support the creation of a valid charitable trust'. . . . `A charitable trust is one which performs some governmental function, such as fostering education, relief of poverty, careof the sick or aged, burial of the dead, or performs some CT Page 3776 other public task which relieves the governmental burden of the state.'" (Emphasis added.) Bannon v. Wise, 41 Conn. Sup. 469,474, 586 A.2d 639 (Super.Ct. 1990), aff'd, 217 Conn. 457,586 Conn. 596 (1991). See also Connecticut Bank TrustCo. v. Ajello, 39 Conn. Sup. 80, 84, 468 A.2d 942 (1983);Lockwood v. Killian, 172 Conn. 496, 500, 375 A.2d 998 (1977).
The School of Nursing was established to "promot[e] and enhanc[e] the quality and efficiency of nursing care at the Hospital through the training and education of nurses principally for employment at the Hospital." (Plaintiff's Complaint, pp. 1-2). The court believes that because the purpose of the donations was to, inter alia, foster education and care of the sick, these ten funds benefiting the School of Nursing fall within the definition of a charitable purpose. Accordingly, the purpose of the ten funds, established for the benefit of the School of Nursing, is charitable in nature.
(2) Impossible, Impracticable or Illegal
The specific purpose of the four bequests and five pecuniary gifts was to benefit the School of Nursing, but because the School of Nursing closed in June, 1976, it is impossible for the donors' specific intent to be effectuated. Therefore, the purpose of the ten funds is impossible to effectuate.
(3) General Charitable Intent
The donors' general charitable intent may be inferred from the size of the donors' donation(s), the lack of an alternative provision should the donation fail, the avoidance of intestacy, and the satisfaction of all family obligations by individual bequests. Lockwood v. Killian, supra, 179 Conn. 67. See also Connecticut Children's Aid Society v.Connecticut Bank Trust, 147 Conn. 554, 560, 163 A.2d 317
(1960). This court will consider each of the donative instruments to determine whether the donors intended to primarily benefit charity and secondarily benefit the School of Nursing.
(a) William Gillett Sexton Fund
William Gillett Sexton ("Mr. Sexton") passed away on December 2, 1943. (Plaintiff's Complaint, p. 4) . Mr. CT Page 3777 Sexton's will, dated May 24, 1935, provided for the payment of debts and funeral expenses and the bequest of his books, jewelry personal effects. (Plaintiff's Complaint, Exhibit A). After these distributions, Mr. Sexton' s will placed the residue of his estate in trust with the Hartford National Bank and Trust Co. Id. The income, after paying administration expenses of trust, was to be paid at least quarterly to Mr. Sexton's mother. Id. Upon the death of Mr. Sexton's mother, twelve general legacies totalling $17,500 were distributed from the principal and accumulated income of the trust. Id. Then, one-half of the remainder of the trust fund was bequeathed to the School of Nursing, "the entire income therefrom to be used solely for the benefit of the student nurses enrolled in the Hospital Training School for Nurses at said hospital, in accordance with the decision of the Board of Directors of said hospital" and the other half to the Alumni Association of the Hartford Public High School. Id. As of September 30, 1995, the balance of the William Gillett Sexton Fund was $324,035.62. (Plaintiff's Complaint, p. 5).
Mr. Sexton specifically provided for his mother and upon his mother's death, twelve general legacies. More importantly, the bulk of his estate, the residue, was bequeathed entirely to charity. Moreover, Mr. Sexton did not provide for an alternate beneficiary or a future interest, such as a reversion, should the charitable bequests fail. Therefore, Mr. Sexton possessed a general charitable intent beyond his specific desire to benefit the School of Nursing.
(b) Endowment Fund for the School of Nursing
Prior to 1941, the Endowment Fund for the School of Nursing was established through, inter alia, individual contributions from students and alumnae of the School of Nursing and staff members of Hartford Hospital. (Plaintiff's Complaint, p. 7). In 1941, Rachel McConnell, Treasurer and Custodian of the Endowment Fund for the School of Nursing, transferred the Endowment Fund for the School of Nursing to Hartford Hospital, in trust, mandating that Hartford Hospital "shall spend the income therefrom for the benefit of The Hartford Hospital School of Nursing under the direction of the Nursing School Committee." (Plaintiff's Complaint, Exhibit B). As of September 30, 1995, the balance of the School of Nursing Endowment Fund was $144,799.15. (Plaintiff's Complaint, p. 8). CT Page 3778
Rachel McConnell, in transferring the endowment fund to Hartford Hospital, did not provide for an alternative beneficiary or a future interest, such as a reversion, should the gift fail. Moreover, the endowment was created by the students and alumnae of the School of Nursing and the staff at Hartford Hospital. Based on these factors, the court finds that the donors possessed a general charitable intent beyond their specific desire to benefit the School of Nursing.
(c) Austin Cornelius Dunham Training School Nurses' Prize Fund
"Austin C. Dunham (`Mr. Dunham'), a life long resident of Hartford, was a successful business person, who, during his lifetime, enjoyed a close affiliation with the Hospital. From 1908 until 1917, Mr. Dunham served as President of the Hospital Board of Managing Directors and he was a generous contributor to various Hospital projects, including endowment of a laboratory at the Hospital, gift of the Dunham operating room and subscription to an addition to a residence for nurses at the Hospital." (Plaintiff's Complaint, p. 10). On February 21, 1912, Mr. Dunham donated $2,500 to Hartford Hospital. (Plaintiff's Complaint, Exhibit C). Mr. Dunham directed that the proceeds of this investment be "applied to two first prizes of $50.00 each, — one of them to be given to the best pupil in the second class of the Hartford Training School for Nurses, at its graduation, who shall pass such examinations as shall place her at the head; and the second to the best pupil in the third class who shall pass the corresponding examination." Id. Mr. Dunham further provided that "[i]f any sum should be left over from the income, I wish it to be applied to the benefit of the nurses of the Training School in any way that Miss Sutherland (Principal of the Training School) or her successor, shall deem best." Id. As of September 30, 1995, the balance of the Austin Cornelius Dunham Training School Nurses' Prizes Fund was $46,107.97. (Plaintiff's Complaint, p. 11).
Prior to the $2,500 donation, Mr. Dunham had already evidenced his charitable nature by contributing to various hospital projects. Thus the $2,500 donation was simply another charitable gesture by Mr. Dunham. In addition, with respect to the $2,500 donation, Mr. Dunham did not provide for an alternate beneficiary or a future interest, such as a reversion, should the gift fail. Accordingly, these factors CT Page 3779 demonstrate Mr. Dunham's general charitable intent beyond his specific desire to benefit the School of Nursing.
(d) Doctor John Butler McCook Fund
"Dr. John Butler McCook (`Dr. McCook') was a prominent Hartford physician who served as Assistant Surgeon and for many years as Consulting Surgeon at the Hospital." (Plaintiff's Complaint, p. 13). On June 8, 1948, Frances A. McCook and Anson T. McCook, Dr. McCook's siblings, donated "[t]he Doctor John Butler McCook Memorial Medal, designed and cast for us by the Gorham Company. We are requesting that they hold the die subject to your order. The Book of Memory, printed and bound by the Case, Lockwood and Brainard Company, to be held in the custody of the School of Nursing . . . A memorial Fund of One Thousand Five Hundred Dollars to be held permanently for the purpose of enabling the Hospital to provide annually the Medal which shall be presented at each graduation of the School of Nursing." (Plaintiff's Complaint, Exhibit D). Dr. McCook's siblings went on to clarify their intent, stating that "[i]n establishing this memorial, it is our purpose, as we understand it is that of the Hartford Hospital in accepting it, that this Medal and Book shall become a permanent part of the life of the Hospital and its School of Nursing, to both of which our brother gave so much thought and heart." Id. Pursuant to this donation, the Doctor John Butler McCook Memorial Medal for Merit was to be "awarded annually to a member of the graduating class of the Hartford Hospital School of Nursing for consistent and outstanding efficiency in the practice of nursing, high standards of honor and special qualities of conscientiousness, kindness and devotion to duty." (Plaintiff's Complaint, p. 15). As of September 30, 1995, the balance of the Doctor John Butler McCook Memorial was $28,977.02. Id.
Dr. McCook's siblings clearly indicated that the gift was permanent, thereby providing for no alternate beneficiary or future interest, such as a reversion, should the gift fail. The court believes that the absence of such a provision, in addition to the standards for the award; efficiency, honor, conscientiousness, kindness, and duty, evidence the general charitable intent of Dr. McCook's siblings beyond their specific desire to benefit the School of Nursing.
(e) Sophia A. Risley Fund
CT Page 3780
On January 30, 1940, Sophia A. Risley ("Ms. Risley") passed away. (Complaint, p. 17). Ms. Risley's will, dated December 18, 1938, directed the payment of last illness and funeral expenses and the specific bequest of her furniture, personal effects, clothing and jewelry. (Plaintiff's Complaint, Exhibit E). Ms. Risley also made twenty general legacies, in amounts varying from $200 to $5,000, and totalling $24,600. Id. Specifically, Ms. Risley bequeathed "the sum of Fifteen Hundred (1500) Dollars to be known as the `Sophia A. Risley Fund', the income of which is to be used to assist needy students of the Training School." Id. The residuary beneficiaries were six of the general legatees, including the Salvation Army, the Christ Church Cathedral and the Young Women's Christian Association of Hartford. As of September 30, 1995, the Sophia A. Risley Fund had a principal balance of $27,249.96 and accumulated income of $26,196.87. (Plaintiff's Complaint, p. 18).
Ms. Risley provided for twelve individual beneficiaries, with general legacies totalling $9,800. In addition, Ms. Risley bequeathed general legacies to eight charities, totalling $14,800. Moreover, Ms. Risley delineated six residuary beneficiaries, including three charities. It is submitted that the size of the charitable bequests, the satisfaction of other individual bequests, and the designation of three charities as residuary beneficiaries, demonstrate Ms. Risley's general charitable intent beyond her specific desire to benefit the School of Nursing.
 (f) Doctor Oliver C. Smith Fund No. 1 and the Doctor Oliver C. Smith Fund No. 3
"Dr. Oliver C. Smith (`Dr. Smith') was a prominent Hartford physician who served as Assistant Surgeon and for many years as Senior Surgeon at Hartford Hospital." (Plaintiff's Complaint, p. 20). On March 27, 1915, Dr. Smith passed away. Id. Dr. Smith's will, dated March 2, 1915, made twenty-four general legacies, totalling $42,750. (Plaintiff's Complaint, Exhibit F). Out of these twenty-four general legacies, ten were bequeathed to charities, nine to relatives, four to employees, and one to the grandson of Dr. Smith's former associate. Id. Out of the ten charitable bequests, Dr. Smith made two general legacies to the School of Nursing. Id. The first, known as the Doctor Oliver C. Smith Fund No. CT Page 3781 1, bequeathed $1,000 to "Hartford Hospital to be held and invested as a separate fund and the income thereof to be annually awarded as a prize to that member of the graduating class of Hartford Hospital Training School for Nurses who shall attain the highest standing in examinations and practical work at the time of graduation." Id. The second, known as the Doctor Oliver C. Smith Fund No. 3, bequeathed $500 to "Hartford Hospital for the construction and care of recreation and gymnasium facilities for the members of Hartford Hospital Training School for Nurses." Id. The residue of Dr. Smith's estate was devised to Dr. Smith's son and daughter. As of September 30, 1995, Fund No. 1 had a balance of $9,668.70. (Plaintiff's Complaint, p. 21). On the same date, Fund No. 3 had a balance of $9,221.71. Id., p. 23.
Dr. Smith explicitly provided for his relatives and employees. In addition, Dr. Smith made ten general legacies and one specific bequest to charity. These bequests, as well as Dr. Smith's commitment to medicine, demonstrate his general charitable intent beyond his specific desire to benefit the School of Nursing.
(g) School of Nursing Loan Fund
In or around 1940, Hartford Hospital established the School of Nursing Loan Fund from individual contributions made by, inter alia, the students and alumnae of the School of Nursing and staff members at Hartford Hospital. (Plaintiff's Complaint, pp. 25-26). The purpose of this fund was to provide financial assistance to students attending the School of Nursing. Id., p. 26. As of September 30, 1995, the School of Nursing Loan Fund had a principal balance of $9,908.54 with accumulated income of $4,823.01. Id.
The School of Nursing Loan Fund was established by individuals closely affiliated with Hartford Hospital and the School of Nursing. In addition, in forming this fund, the donors did not provide for an alternate beneficiary or a future interest, such as a reversion, should the gift fail. These factors demonstrate the donors' general charitable intent beyond their specific desire to benefit the School of Nursing.
(h) Maude Ashley Scholarship Fund
CT Page 3782
"Maude Ashley (`Mrs. Ashley') graduated from the School of Nursing in 1905 and thereafter enjoyed a close affiliation with the Hospital and its School of Nursing." (Plaintiff's Complaint, p. 28). Mrs. Ashley donated $500 to Hartford Hospital directing that "a gift of $25.00 to be known as the Maude Ashley Scholarship be awarded annually to a senior in the School of Nursing . . ." (Plaintiff's Complaint, Exhibit G). This annual scholarship was to be taken only from the income of the principal. Id. As of September 30, 1995, the balance of the Maude Ashley Scholarship Fund was $1,355.70. (Plaintiff's Complaint, p. 29).
Mrs. Ashley did not provide for an alternate beneficiary or a future interest, such as a reversion, should the gift fail. This factor, in conjunction with her relationship to the School of Nursing, demonstrates Mrs. Ashley's general charitable intent beyond her specific desire to benefit the School of Nursing.
(i) School of Nursing Consolidated Income Fund
Hartford Hospital established the School of Nursing Consolidated Income Fund to "facilitate investment, management and distribution of income from the various endowment funds established for the benefit of the School of Nursing . . ." (Plaintiff's Complaint, p. 31). Income from the William Gillett Sexton Fund, the School of Nursing Endowment Fund, the Austin Dunham Training School Fund, the John Butler McCook Memorial Fund, the Dr. Oliver Smith Fund No. 1 and the Dr. Oliver Smith Fund No. 3 has been deposited into this fund. Id. As of September 30, 1995, the balance of the School of Nursing Consolidated Income Fund was $563,640.70. Id.
The School of Nursing Consolidated Income Fund was formed from income derived from the endowment funds. As just discussed, each of the donors of the endowment funds demonstrated a general intent to devote the property to a charitable use. Accordingly, the School of Nursing Consolidated Income Fund, derivative of the endowment funds, also possesses the same general charitable intent.
C. Conclusion
Based on the foregoing, and pursuant to General Statutes § 45a-533 and the modified doctrine of cy pres, or CT Page 3783 approximation, the court is of the opinion that the specific restriction placed on the ten funds, limiting their use to the School of Nursing should be released and the principal and/or income from the funds, as directed by the donors, be used by Hartford Hospital for the benefit of the Division of Nursing Education and Research. Accordingly, the plaintiff and defendant's joint motion for summary judgment is granted.
Hale, Judge/Referee